UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| DENISE SEDGWICK, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:24-cv-00543-JRS-CSW |
| ) | |
| CENTER GROVE COMMUNITY SCHOOL ) | |
| CORPORATION, ) | |
| ) | |
| Defendant. ) | |

**Order Granting Summary Judgment**

Denise Sedgwick sued her former employer Center Grove Community School Corporation ("Center Grove") for sex and age discrimination. Sedgwick alleges that Center Grove subjected her to a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), and the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634. Center Grove moves for summary judgment. (ECF No. 31.)

**I. Background**

Denise Sedgwick is a fifty-eight-year-old female teacher. (Pl.'s Resp. at 1, ECF No. 33.) In mid-2018, she started teaching sixth grade full-time at Center Grove Middle School North. (*Id.*) Her allegations of a hostile work environment relate to Davin Harpe, who at all relevant times was the school's principal, her supervisor. (Sedgwick Dep. 20:9–12, ECF No. 33-1.) According to Sedgwick, Harpe disliked the sixth-grade teachers, and he "made comments to [them] frequently that [they] were constantly 'all on red'" meaning that "everybody was uptight" and "difficult to deal

with." (*Id.* at 57:22–58:7.)  Sedgwick heard Harpe say that when he was hired, he was tasked with "squelch[ing]" the sixth-grade teachers. (*Id.* at 73:9–19.)  At that time, all of the sixth-grade teachers were female. (*Id.* at 71:1–2.)  Sedgwick understood Harpe to mean that he felt the teachers were always "on red," "always challenging him," and he was "going to get [them] in line." (*Id.* at 73:9–19.)

In 2019, in order to avoid Harpe's negative interactions with the sixth-grade faculty, Sedgwick transitioned to teaching eighth graders in computer applications. (*Id.* at 58:8–19; Pl.'s Resp. at 1, ECF No. 33.)  At the time, Sedgwick did not feel that Harpe was targeting her, but was targeting the sixth-grade team. (Sedgwick Dep. at 58:8–19, ECF No. 33-1.)  When Sedgwick became the union's building representative, serving as a liaison between the union members in the building and the administration, (*id.* at 18:2–17, 57:11–18; Compl. ¶ 9, ECF No. 1; Answer ¶ 9, ECF No. 12), tensions developed between Sedgwick and Harpe, (Sedgwick Dep. 32:19–23, ECF No. 33-1 ("Prior to my becoming a building rep, my relationship with [Harpe], it seemed fine.  But after becoming a building rep, that's when I feel that there was a kind of a shift.")).

Sedgwick and Beth Heavin, the other building representative and a sixth-grade teacher, had monthly meetings with Harpe and the assistant principal. (Heavin Decl. ¶¶ 2–3, ECF No. 33-2; Sedgwick Dep. 20:8–21:3, ECF No. 33-1; Compl. ¶ 9, ECF No. 1; Answer ¶ 9, ECF No. 12.)  According to Sedgwick, the monthly meetings were often contentious and became "hostile." (Sedgwick Dep. 23:10–19, 81:15–25, ECF No. 33-1.)  The meetings with Harpe were "so contentious" that the director of HR and the

union president sat in on them for several months, and Harpe was asked to attend other building discussion meetings to see how they were run. (Sedgwick Dep. 81:24–82:13, ECF No. 32-5.)

On multiple occasions in the meetings Sedgwick brought up the same issue—that the unified arts teachers wanted "more equal prep time." (*Id.* at 21:20–24, 22:11–19.) Because the issue had been raised multiple times, Harpe would "get very angry," "raise his voice," and said, "This has been brought up. This has been discussed. I don't want to hear about this again. Don't bring up again.'" (*Id.* at 23:10–17, 24:13–14 ("This has been brought up every year I have been principal.").) According to Sedgwick, any time she brought a complaint to Harpe, he took it "as a personal attack on his leadership" and "rais[ed] his voice," (*id.* at 26:4–8); and any meeting or conversation with Harpe was "very strained," (*id.* at 34:19–24). In May 2023, Sedgwick stepped down from the union building representative position because she did not believe she was being an effective representative and could not communicate with Harpe. (*Id.* at 25:24–26:8.)

When Sedgwick raised issues in meetings, Harpe would "minimize" her concerns. (*Id.* at 62:3–11.) In monthly meetings, Harpe used an intimidating tone of voice and used words to let Sedgwick know "who is in charge" and to keep her in her place. (*Id.* at 50:3–15.) Heavin witnessed numerous occasions when Harpe raised his voice at Sedgwick to the point of yelling at her. (Heavin Decl. ¶¶ 2, 8, ECF No. 33-2.) No male teachers or staff have complained to Heavin about abusive behavior by Harpe. (*Id.* ¶ 6.)

3

When asked about her relationship with Harpe outside the monthly meetings as union building representative, Sedgwick said that any meeting or conversation with him was "very strained." (Sedgwick Dep. 34:22–24, ECF No. 32-5.) When asked if she thought that was related to her position as union representative, Sedgwick answered, "It's hard to say. I really don't know." (*Id.* at 34:25–35:2.) Sedgwick testified that Harpe never said anything to her that was based upon her sex and never said anything derogatory about women. (Sedgwick Dep. 160:13–161:3, ECF No. 32-5.) Any critical comments he made about other female teachers "were made in reference to their effectiveness." (*Id.* at 161:17–162:23.)

In August 2023, Sedgwick believed there was a medical emergency when a student in her classroom began convulsing and falling out of her chair. (Sedgwick Dep. 88:2–14, ECF No. 33-1.) Sedgwick activated the Centegix emergency system by pressing a button on an electronic badge, alerting the school administration and a school resource officer of a medical emergency; the resource officer and school administrators arrived at the classroom in response. (*Id.* at 83:23–84:14, 88:2–91:8.) When the school social worker arrived, she said the situation was not an emergency and told Sedgwick that she should not have pushed the button. (*Id.* at 92:9–93:14.)

Sedgwick asked for clarification on use of the Centegix system, which prompted a late August/early September meeting with Harpe and two other teachers. (*Id.* at 89:4–7, 95:9–18, 141:2–20.) In the meeting, Harpe explained that the police felt they were being dispatched unnecessarily and requested that the teachers use the emergency button only for true emergencies. (*Id.* at 98:21–99:20.) He told Sedgwick

4

that she should not have pushed the emergency button and that she should be mindful of whether the situation is a true emergency. (*Id.* at 128:4–16, ECF No. 32-5.) Nonetheless, Sedgwick thought there was a lack of clarity regarding use of the Centegix system. (*Id.* at 141:24–142:4.)

After that meeting, Sedgwick reached out to the union's co-president, David Lawson, to share her concerns about the Centegix protocol and the incident in her classroom. (*Id.* at 101:24–103:2, 108:24–109:9, ECF No. 33-1.) She reported that ten minutes passed before anyone from the school arrived in her classroom, (*id.* 104:1–16); this was not accurate—video from the incident shows that the school responded within two minutes, (*id.* at 104:22–25). Sedgwick later admitted she was mistaken about the time, explaining that in the stress of the moment, it seemed like ten minutes had elapsed. (*Id.* at 105:7–16; 105:20–23.) Sedgwick was unaware of the actual amount of time until a November 2 meeting with Harpe. (*Id.* at 105:20–25.)

On September 7, Lawson emailed the Center Grove Superintendent and others expressing staff concerns about Centegix and the August incident in Sedgwick's classroom. (*Id.*, Ex. 4, ECF No. 32-5 at 154–55.) Sedgwick, who had been blind copied on the email, thanked Lawson for addressing the concern and wrote that teachers were confused about when to use Centegix, "given the communication and feedback" they recently received. (ECF No. 32-5 at 156.) She added that she would be more "comfortable knowing that when [emergency] situations occur . . ., an administrator will be arriving to assist within minutes." (*Id.*) The Superintendent replied, stating that the incident was an isolated issue and that Harpe and the response team

5

responded appropriately to the situation. (ECF No. 32-5 at 152–53.) The Superintendent expressed disappointment about the union "unnecessarily" copying others on the email and asked that the union instruct its members to handle their concerns with the building administrator. (*Id.*)

On November 2, Harpe called Sedgwick into his office for a meeting to discuss the incident in Sedgwick's classroom and Lawson's email to the Superintendent. (Sedgwick Dep., Ex. 4, ECF No. 32-5; Sedgwick Dep. 112:10–13.) Sedgwick describes Harpe as "verbally aggressive" toward her. (Sedgwick Dep. 52:12–15, ECF No. 33-1.) During the one-hour meeting Harpe was very upset and, raising his voice told Sedgwick: "You went behind my back. This email went out to all of my superiors. . . . You were attacking me[;] you were attacking my administration. I'm not happy with this going out. It's full of lies." (*Id.* at 112:18–25.) Harpe asked Sedgwick, "Why are you still here?" (*Id.* at 145:4–5.) Sedgwick said, "Excuse me?" and Harpe replied, "Why are you still here? You hate this place. You're miserable." (*Id.* at 52:10–20.) Sedgwick said she was there because it was her job, and Harpe told her to consider transferring to another school. (*Id.* at 52:21–24.) Harpe told Sedgwick that nobody liked her and no one wanted to be around her. (*Id.* at 53:1–5.) He also said that she breeds hostility and fosters negativity in the building. (*Id.* at 53:5–6.) When Sedgwick responded that she did not have issues with anyone, Harpe told her to talk to her peers and administrators because "everybody feels the same way about you." (*Id.* at 53:7–12.)

By this time, Sedgwick felt beat down and questioned her relationship with her co-workers and her effectiveness as a teacher. (*Id.* at 168:3–22.) The next day, Sedgwick saw her psychiatrist and was prescribed medication for work-related anxiety. (*Id.* at 54:7–9, 54:21–55:12.)

Sedgwick took twelve weeks of leave under the Family and Medical Leave Act. (*Id.* at 78:10–79:14.) While on leave, she filed a charge of discrimination with the Equal Employment Opportunity Commission. (*Id.* at 79:13–15.) When she returned to work, Harpe avoided her. (*Id.* at 81:4–5.) When they crossed paths, Sedgwick said hello, but Harpe often did not respond. (*Id.* at 81:5–8.) Sedgwick resigned from her employment in October 2024 to care for her parents. (*Id.* at 80:3–25.)

As noted, Sedgwick alleges that Center Grove subjected her to a hostile work environment based on her sex and age.

## II.     Legal Standard

A motion for summary judgment should be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[W]hether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits." *Paschall v. Tube Processing Corp.*, No. 1:19-cv-04488, 2021 WL 1390350, at *1 (S.D. Ind. Apr. 13, 2021) (citing Fed. R. Civ. P. 56(c)(1)(A)).

At summary judgment, the Court views the record and draws all reasonable inferences in the light most favorable to the nonmoving party. *Khungar v. Access*

*Cmty. Health Network*, 985 F.3d 565, 572 (7th Cir. 2021). The Court cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *Jaranowski v. Indiana Harbor Belt R.R. Co.*, 72 F.4th 744, 750 (7th Cir. 2023).

### III. Discussion

Before discussing the merits, the Court addresses the admissibility of certain evidence and what evidence may properly be considered on summary judgment.

#### A. Consideration of Evidence

At summary judgment, the Court "may consider only admissible evidence." *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) (citation omitted). "A party may not rely upon inadmissible hearsay to oppose a motion for summary judgment." *Id.* "The evidence need not be admissible in form, but must be admissible in content, such that, for instance, affidavits may be considered if the substitution of oral testimony for the affidavit statements would make the evidence admissible at trial." *Wheatley v. Factory Card & Party Outlet*, 826 F.3d 412, 420 (7th Cir. 2016) (citation omitted).

Center Grove argues Sedgwick relies on some inadmissible evidence. Sedgwick cites Beth Heavin's declaration, (*see, e.g.*, Pl.'s Resp. at 2, 7, 8, ECF No. 33), in which Heavin attests to other female teachers' and staffs' complaints to her that Harpe treated them in a hostile and disrespectful manner, and male teachers' or staffs' reports to Heavin that Harpe told them their job was "to manage the 6th grade teachers," with Harpe stating that the sixth grade teachers were always "on red," (Heavin Decl. ¶¶ 4–7, ECF No. 33-2). Heavin attesting to what other teachers or staff

8

told her is inadmissible hearsay because it is offered to prove the truth of the teachers' or staffs' assertions. Fed. R. Evid. 801, 802; *see, e.g., Flanagan v. Off. of Chief Judge of Cir. Ct. of Cook Cnty., Ill.*, 893 F.3d 372, 375 (7th Cir. 2018) (explaining that the plaintiff's statements about what a colleague told her "were properly ignored because they suffer from a *double* hearsay problem: they are statements of what . . . [the colleague said others] had said"). Heavin's testimony about what other teachers or staff told her must be made in-court, by the teachers or staff themselves, so they can be subject to cross-examination. The Court does not consider the inadmissible hearsay.

Paragraph nine of Heavin's Declaration is also inadmissible. There, Heavin states: "In my opinion, Dr. Harpe treated Denise Sedgwick in a subhuman manner throughout her employment and often minimized her importance." (Heavin Decl. ¶ 9, ECF No. 33-2.) Heavin's characterization of Harpe's treatment of Sedgwick is inadmissible because it is a bare conclusion unsupported by any basis for her opinion. *See Tribble v. Evangelides*, 670 F.3d 753, 758 (7th Cir. 2012) (quoting *United States v. Conn*, 297 F.3d 548, 554 (7th Cir. 2002)) ("Lay opinion most often takes the form of a summary of firsthand sensory observations and may not provide specialized explanations or interpretations that an untrained layman could not make if perceiving the same acts or events.") (citation modified); *United States v. Noel*, 581 F.3d 490, 496 (7th Cir. 2009) (explaining that under Rule 701(b) "a lay witness's purpose is to inform the jury what is in the evidence, not to tell it what inferences to draw from that evidence").

9

However, parts of Heavin's declaration are admissible. Heavin states that no male teachers or staff have ever approached her with complaints of abusive behavior. (Heavin Decl. ¶ 7, ECF No. 33-2.) This statement is not hearsay. Rule 801 provides that "hearsay" is an oral or written assertion or nonverbal conduct that is intended to be an assertion. The male teachers and staffs' failure to make complaints was not intended to be an assertion. The Court considers that no male teachers or staff complained to Heavin about abusive behavior by Harpe.

In paragraph eight, Heavin declares that she personally witnessed Harpe on numerous occasions raising his voice to Sedgwick to the point of yelling at her. (*Id.* ¶ 8.) This is admissible because it is based on Heavin's personal observations. In paragraph ten, Heavin declares that Harpe told her that Sedgwick was a "negative force in the building." (*Id.* ¶ 10.) There is no hearsay problem because Heavin personally heard Harpe's statements, which are statements by an opposing party's agent or employee, and are not hearsay. Fed. R. Evid. 801(d)(2)(D). Therefore, the Court considers paragraphs eight and ten of Heavin's declaration when assessing Sedgwick's evidence.

Some of Sedgwick's cited deposition testimony is inadmissible hearsay. Sedgwick says that in 2018–2020, Harpe warned three new male teachers that they would be working with women who were always "on red" and that Harpe needed their "male presence to come in and balance the situation." (Sedgwick Dep. 70:11–72:11, ECF No. 33-1.) But Sedgwick did not hear Harpe make these comments; rather, one of the male teachers reported them to Sedgwick. (*Id.*) While Harpe's comments to the male

10

teachers are not hearsay, Sedgwick's assertion as to what the male teacher told her is hearsay when offered to prove the truth of the matter asserted, *see* Fed. R. Evid. 801, 802; *see, e.g., Flanagan*, 893 F.3d at 375, and will not be considered.

Similarly, Sedgwick recounts colleague Joe Shimp's apology to her for Harpe's treatment of her during a meeting, (Pl.'s Resp., ¶ 20, ECF No. 33 (citing Sedgwick Dep. 62:24–63:3, ECF No. 33-1)); other colleagues' comments to Sedgwick expressing disbelief as to how Harpe talked to her, (*id.* ¶ 21 (citing Sedgwick Dep. 63:13–21, ECF No. 33-1)); and concerns expressed to her by two male teachers, (*id.* ¶ 22 (citing Sedgwick Dep. 63:22–64:5, ECF No. 33-1)). These out-of-court statements by Sedgwick's colleagues contain an assertion that Harpe treated Sedgwick poorly, and the statements are being offered to prove that fact. Thus, they are inadmissible hearsay and the Court does not consider them at summary judgment.

Sedgwick's testimony that Nicole Ryan was a secretary in the building who "resigned for the way Harpe treated her," (*id.* ¶ 66 (citing Sedgwick Dep. 176:19–177:13, ECF No. 33-1)), is inadmissible because Sedgwick failed to show her assertion was based on personal knowledge. *See* Fed. R. Civ. P. 56(e); *James v. Hale*, 959 F.3d 307, 315 (7th Cir. 2020) (affidavit or declaration submitted at summary judgment must show that affiant has personal knowledge of the facts asserted).

### B. Analysis of Claims

Title VII prohibits an employer from creating a hostile work environment based on an employee's sex. *Huri v. Off. of the Chief Judge of the Cir. Ct. of Cook Cnty.*, 804 F.3d 826, 831 (7th Cir. 2015). "A work environment is hostile under Title VII '[w]hen

11

the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Scaife v. U.S. Dep't of Veterans Affs.*, 49 F.4th 1109, 1115 (7th Cir. 2022) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)) (citation modified). To prove a hostile work environment claim, a plaintiff must show: "(1) the work environment was both subjectively and objectively offensive; (2) the harassment was based on membership in a protected class; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Id.* at 1115–16. Hostile work environment claims under the ADEA are analyzed the same way as Title VII hostile work environment claims. *See, e.g., Brooks v. Avancez*, 39 F.4th 424, 441–42 (7th Cir. 2022) (citing *Tyburski v. City of Chicago*, 964 F.3d 590, 600 (7th Cir. 2020)) (assuming that hostile work environment claims can be brought under the ADEA and applying the same framework used to analyze such claims brought under Title VII).

In moving for summary judgment, Center Grove argues that there is no evidence of any discriminatory animus and that Harpe and Sedgwick's conflict was nothing more than a personality conflict. (Def.'s Mem. 15–17, ECF No. 32.) Center Grove also argues that Sedgwick cannot establish severe or pervasive harassment. The Court concludes that Sedgwick has not presented sufficient evidence from which a reasonable jury could find that the alleged harassment was based on her sex or that the alleged harassment was severe or pervasive.[1]

---

[1] Center Grove also argues there is no evidence that the alleged harassment was based on Sedgwick's age. (Def's Mem. 16, ECF No. 32.) Sedgwick does not respond to this argument

12

Although "the alleged conduct need not 'consist of pressure for sex, intimate touching, or a barrage of deeply offensive sexual comments,' the 'demeaning, ostracizing, or even terrorizing' conduct must still be related to gender." *Scaife*, 49 F.4th at 1117 (citing *EEOC v. Costco Wholesale Corp.*, 903 F.3d 618, 626 (7th Cir. 2018)). Rather, "words or conduct demonstrating 'anti-female animus' can support a sexual harassment claim based on a hostile work environment." *Passananti v. Cook Cnty.*, 689 F.3d 655, 664 (7th Cir. 2012) (quoting *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 788 (7th Cir. 2007)). A plaintiff can prevail "when the work environment is hostile because it is 'sexist rather than sexual.'" *Id.*

Sedgwick's alleged harassment does not involve conduct of a sexual nature. Instead, Sedgwick claims that Harpe was abusive, specifically that he frequently raised his voice at and yelled at her, he used an intimidating and domineering tone of voice, he minimized the concerns she raised, and he told Heavin that Sedgwick was a "negative force in the building." And at the November 2 meeting, Harpe gave Sedgwick an aggressive reprimand and demeaned her by saying that no one liked her or wanted to be around her. He also said that she breeds hostility and fosters negativity in the building. However, when asked if her "strained" relationship with Harpe was related to her position as union building representative, Sedgwick answered, "It's hard to say. I really don't know." (Sedgwick Dep. 34:22–35:2, ECF No. 32-5.) Harpe never said anything to Sedgwick that was based upon her sex and

---

and she cites no evidence to suggest any challenged conduct was based on her age. (Pl.'s Resp. 15, ECF No. 33.) Thus, summary judgment is granted to Center Grove on Sedgwick's ADEA claim.

never said anything derogatory about women. (*Id.* at 160:13–161:3.) And any critical comments made by Harpe about other female teachers "were made in reference to their effectiveness." (*Id.* at 161:17–162:23.) While Harpe was rude, unprofessional, and mean, Sedgwick presents no evidence to raise a reasonable inference that his conduct was related to her sex.

Instead, Sedgwick points to the facts that she is female; that all the sixth-grade teachers were female when Harpe was hired as principal; that Harpe said he was hired to "squelch" the sixth-grade teachers, which Sedgwick understood meant he felt the teachers were always challenging him and he was going to get them "in line," (Sedgwick Dep. 73:9–19, ECF No. 33-1), and the absence of any complaints to Heavin by male teachers or staff about abusive behavior by Harpe. This evidence is insufficient to raise a reasonable inference that Harpe's conduct toward Sedgwick was based on her sex.

In addition, Sedgwick has not produced evidence from which a reasonable jury could find that the alleged harassment was severe or pervasive. To determine if conduct is severe or pervasive, courts consider the totality of the circumstances, which includes: "(1) the frequency of the discriminatory conduct; (2) how offensive a reasonable person would deem it to be; (3) whether it is physically threatening or humiliating conduct as opposed to verbal abuse; (4) whether it unreasonably interferes with an employee's work performance; and (5) whether it is directed at the victim." *Scaife*, 49 F.4th at 1116. To be severe or pervasive, "the conduct must be 'extreme' considering all the circumstances." *Rongere v. City of Rockford*, 99 F.4th

1095, 1105 (7th Cir. 2024) (quoting *Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 600 (7th Cir. 2021)).

Here, while Harpe's treatment of Sedgwick was rude, unprofessional, and during the November 2 meeting, even mean, under all the circumstances, Sedgwick's work environment was not "extreme" or "permeated with intimidation, ridicule, and insult." *See id.* Harpe frequently raised his voice at Sedgwick and yelled at her, and he used an intimidating and domineering tone with her. While Sedgwick has evidence that Harpe would "minimize" her concerns in front of her co-workers when she raised issues in meetings, Sedgwick did not produce any evidence that the minimization strayed beyond the professional and into personal criticism or was otherwise humiliating. To be sure, Harpe attacked Sedgwick in the November 2 meeting—saying that no one liked her and that she should consider transferring to another school. But that was an isolated incident. In sum, when considering the totality of the circumstances, no reasonable jury could find that Sedgewick was subjected to severe or pervasive conduct.

For these reasons, Sedgwick has presented insufficient evidence to prevail on her hostile work environment claims, and summary judgment is **granted** in favor of Center Grove.

## Conclusion

Defendant's Motion for Summary Judgment, (ECF No. 31), is **granted**. Sedgwick's hostile work environment claims under Title VII and the ADEA are

15

**dismissed with prejudice.** The Court will issue final judgment under Federal Rule of Civil Procedure 58. The Clerk **shall** close this case.

**SO ORDERED.**

Date: 12/29/2025

JAMES R. SWEENEY II, CHIEF JUDGE
United States District Court
Southern District of Indiana

Distribution by CM/ECF to registered counsel of record